ADAM L. BRAVERMAN
United States Attorney
BRUCE C. SMITH
Assistant U.S. Attorney
California State Bar No. 078225
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8266
E-mail: bruce.smith@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. '18CV2697 DMS NLS |
|---|---|
| Plaintiff, | COMPLAINT FOR FORFEITURE |
| v. | |
| $22,120.00 IN U.S. CURRENCY, | |
| Defendant. | |

By way of complaint against the defendant $22,120.00 IN U.S. CURRENCY ("$22,120 in currency"), plaintiff UNITED STATES OF AMERICA alleges:

1. This Court has jurisdiction over this action by virtue of the provisions of Title 28, United States Code, Section 1355(a) and Title 21, United States Code, Section 881(a)(6), because the defendant $22,120 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, or proceeds traceable to an exchange for controlled substances in violation of Chapter 13 of Title 21, United States Code.

2. Venue is proper in this district pursuant to

//

USAO:2018v00333:BCS/bfs

Title 28, United States Code, Section 1395 because the defendant $22,120 in currency was found in this district.

   3. On June 27, 2018, in the Southern District of California, at the San Diego International Airport ("SDIA"), members of the San Diego Integrated Narcotics Task Force ("NTF") Commercial Interdiction Unit were on duty, seeking to intercept and seize controlled substances and proceeds from the sales of controlled substances passing though the airport.

      A.  The Task Force officers ("TFO") were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA, and the aircraft that arrived and departed there, to distribute controlled substances throughout the United States.

      B.  The Task Force officers were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA, and the aircraft that arrived and departed there, to transport drug sales proceeds and funds to be used to purchase drugs in and out of San Diego.  Those proceeds and funds were usually in the form of United States currency.

      C.  The Task Force officers were trained and experienced, and knew persons engaged in the commercial interstate distribution of controlled substances frequently used couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of San Diego.  SDIA and the aircraft that arrived

and departed there are relied upon as a means of sending and receiving such couriers.

4. On or about June 27, 2018, NTF Task Force officers and Drug Enforcement Administration ("DEA") agents assigned to NTF Team 8 at SDIA learned that AL JACKSON ("JACKSON") was traveling from Gulf Port, Mississippi to SDIA aboard United Airlines Flight 1919.

    A. JACKSON was traveling from Mississippi to SDIA on a one-way ticket, purchased within 24 hours of the scheduled departure time for the flight.

    B. JACKSON, a resident of Biloxi, Mississippi, did not purchase a ticket for a return flight.

    C. The Task Force officers learned JACKSON was flying with no checked luggage.

    D. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug currency couriers. They knew the purchase of a cross-country, one-way airline flight ticket less than 24 hours before departure is unusual, and can be indicative the traveler is an illegal drug or drug currency courier.

    E. The TFOs and DEA agents knew the general traveling public will purchase round-trip airline tickets weeks or even months in advance of the scheduled departure date.

    F. An advance round-trip ticket purchase results in lower fares for the traveler. Purchasing an airline ticket even a week in advance of departure all but guarantees one will pay the highest fare.

  G. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug currency couriers.  They knew illegal drug and drug currency couriers often times do not know when drugs or currency will be available for transport until the last minute.  The nature of illegal drug trafficking, and its uncertainties, often compels couriers and their employers to purchase airline tickets close to the departure date.

  H. The TFOs and DEA agents were trained and experienced, and knew the Southern District of California is a primary source region for controlled substances cultivated and manufactured on the west coast of the United States ("west coast"), Latin America, and elsewhere.

  I. The TFOs and DEA agents were trained and experienced, and knew controlled substances cultivated and manufactured on the west coast, in Latin America, and elsewhere were sent and distributed for resale from source regions such as San Diego to all points north and east within the United States.  In their experience, Mississippi was a known destination market for controlled substances.

  5. The TFOs and DEA agents researched JACKSON's criminal history.

  A. JACKSON had a history of arrests in the State of Mississippi for, among other things, in 2013 for illegal possession of controlled substances, possession of marijuana, and illegal possession of a controlled drug.

  B. JACKSON had a history of arrests in the State of //

4

1 Louisiana and a conviction in 2014 for possession of
2 marijuana, a controlled substance.
3     6.  On June 27, 2018, just before 10:45 a.m. in SDIA
4 Terminal Two, Gate 39, the TFOs and DEA agents prepared for
5 the arrival of United Airlines Flight 1919 and
6 passenger JACKSON.
7     7.  At approximately 10:45 a.m., shortly after
8 United Airlines Flight 1919 landed, the TFOs and DEA agents,
9 armed with a physical description of JACKSON, located him as
10 he exited the jet way from Gate 39 and walked into
11 the terminal.
12        A.  The TFOs and DEA agents noted JACKSON was wearing
13 a dark grey T-shirt, jeans, and was carrying a teal colored
14 fabric carry-on bag.
15     8.  DEA Special Agent Beauchamp ("Agent Beauchamp") and
16 DEA Special Agent Hein ("Agent Hein") walked up to JACKSON,
17 identified themselves as law enforcement officers, and showed
18 JACKSON their respective credentials.
19        A.  Agent Beauchamp assured JACKSON he was not in
20 trouble, and asked to speak with JACKSON about his travels.
21        B.  JACKSON told Agent Beauchamp he flew from
22 Mississippi to San Diego.
23        C.  JACKSON told Agent Beauchamp he lived in
24 San Diego, but did not know the name of the district or area
25 of San Diego where he lived, nor did he know the address of
26 his San Diego residence.
27        D.  In response to Agent Beauchamp's request for
28 //

1 identification, JACKSON produced a Mississippi
2 driver's license.
3     E. JACKSON changed his story, and told Agent
4 Beauchamp he was from Mississippi, but was trying to move to
5 San Diego.
6     F. JACKSON told Agent Beauchamp while visiting
7 San Diego, he planned to stay with friends but he did not
8 know his friends' address, nor did he know their names.
9     G. JACKSON told Agent Beauchamp he planned to stay
10 in San Diego for three (3) or four (4) days.
11   9. Agent Beauchamp asked JACKSON for permission to
12 search the contents and interior spaces of JACKSON'S teal
13 colored carry-on bag.
14     A. JACKSON granted consent to examine his carry-on
15 bag, and handed it to Agent Hein.
16     B. Agent Beauchamp asked JACKSON how much money he
17 was carrying.
18     C. JACKSON acknowledged he was carrying money,
19 pointed to a white cloth bag in his teal colored carry-on
20 bag, but said he did not know the dollar amount.
21   10. While examining the contents of JACKSON'S carry-on
22 bag, Agent Hein discovered a large amount of U.S. currency in
23 the white cloth bag.
24     A. The currency in the white cloth bag was divided
25 into approximately 13 bundles.
26     B. Each of the bundles of currency was secured with
27 rubber bands.
28 //

   C. The TFOs and DEA agents were trained and experienced, and knew it was common for drug currency couriers not to know the dollar amount of money they were transporting.

   D. The TFOs and DEA agents were trained and experienced, and knew drug currency couriers do not own the money they transport.

   E. The TFOs and DEA agents were trained and experienced, and knew drug currency couriers are typically hired to perform a discreet task. They are given an amount of currency and a set of instructions relative to their journey. They are told where to take the money, how to get there, and how or to whom it is to be delivered. They are not, however, always told the dollar amount of the currency they are transporting.

   F. The TFOs and DEA agents were trained and experienced, and knew it is also common for the currency carried by drug currency couriers to be subdivided into smaller lots or bundles, and secured with rubber bands.

  11. JACKSON agreed to accompany the officers to the nearby SDIA NTF office, where the contents of JACKSON'S bag could be examined in a private setting, away from the crowds of travelers in the SDIA terminals.

   A. Agent Beauchamp repeated to JACKSON he was not under arrest, and was free to leave.

   B. JACKSON walked with Agent Beauchamp and Agent Hein to the nearby SDIA NTF office.

  12. After arriving at the NTF office, Agent Beauchamp //

7

again told JACKSON he was not under arrest and he was free to leave.

    A. Agent Beauchamp and JACKSON continued to discuss JACKSON'S plans for his visit to San Diego.

    B. JACKSON told Agent Beauchamp he was going to stay at the home of a friend in San Diego, but did not know the district or area of San Diego where the friend lived, nor did JACKSON know the friend's address.

    C. Although JACKSON said he was planning to relocate to San Diego, he did not research the area and had no idea where in the San Diego region he would shop for housing.

13. Upon opening JACKSON'S carry-on bag and examining the currency in the white cloth bag, the agents immediately realized JACKSON was transporting an unusually large amount of money.

    A. Given that JACKSON was only 23 years of age, the agents were curious about JACKSON'S personal finances.

    B. JACKSON said in 2016, when he was 21 years of age, he worked as an electrician for his uncle.

    C. JACKSON said his uncle paid him $23.00 per hour, but JACKSON was paid "in cash."

    D. The agents asked for the uncle's telephone number, so they could call the uncle and confirm JACKSON'S work history, but JACKSON refused to give the agents that information.

    E. JACKSON told the agents he had no documentation,
//

or proof of any type, supporting his work or income history with his uncle.

    F.   JACKSON told Agent Beauchamp his earnings as an electrician were not documented in his income tax returns because he did not file income tax returns.

14. Agent Beauchamp asked JACKSON about his employment and income history since 2016.

    A.   JACKSON told Agent Beauchamp he was actively employed as a professional "rap" or "hip-hop" performer.

    B.   JACKSON explained other such artists paid JACKSON to perform and appear in their recordings and videos.

    C.   When the agents asked for JACKSON'S "stage" or performing name, JACKSON declined to disclose it.

    D.   When the agents asked for JACKSON to guide them to images or videos on social media of JACKSON performing, JACKSON declined to do so.

    E.   JACKSON told the agents he had no documentation, or proof of any type, supporting his work or income history as a professional "rap" or "hip-hop" performer.

    F.   JACKSON told Agent Beauchamp his earnings as a professional "rap" or "hip-hop" performer were not documented in his income tax returns because he did not file income tax returns.

15. Agent Beauchamp asked JACKSON several times to state the dollar amount of the currency he was carrying.

    A.   Each time JACKSON was called upon to state the dollar amount of the currency in his bag, he offered a different total.

9

B. At one point, JACKSON told Agent Beauchamp he was carrying $10,000.00.

C. Later in the conversation, JACKSON told Agent Beauchamp he was carrying $12,000.00.

D. At another point in the interview, JACKSON told Agent Beauchamp he was carrying $15,000.00.

E. It was readily apparent to Agent Beauchamp and the other agents JACKSON had no idea how much money he was transporting.

F. The TFOs and DEA agents were trained and experienced, and knew that it was common for drug currency couriers not to know the dollar amount of money they were transporting.

G. The TFOs and DEA agents were trained and experienced, and knew drug currency couriers do not own the money they transport.

H. The TFOs and DEA agents were trained and experienced, and knew drug currency couriers are typically hired to perform a discreet task. They are given an amount of currency and a set of instructions relative to their journey. They are told where to take the money, how to get there, and how or to whom it is to be delivered. They are not, however, always told the dollar amount of the currency they are transporting.

I. The TFOs and DEA agents were trained and experienced, and knew it is also common for drug currency couriers, when contacted by law enforcement, to understate the amount of money they are transporting.

16. Agent Beauchamp asked JACKSON to explain why the currency inside the white cloth bag was subdivided into bundles and secured with networks of rubber bands.

   A. JACKSON said he divided the currency by denomination to keep track of the total.

   B. The TFOs and DEA agents were trained and experienced, and knew it is common for the currency carried by drug currency couriers to be subdivided into smaller lots or bundles, and secured with rubber bands.

17. The currency discovered in the white cloth bag in JACKSON'S teal colored carry-on bag was subdivided into approximately 13 bundles, each secured by rubber bands.

18. The currency concealed in the white cloth bag was combined, counted, and determined to have a dollar value of $22,120.00, not $10,000.00, or $12,000.00, or $15,000.00 as stated earlier by JACKSON.

19. The currency concealed in the white cloth bag is the defendant $22,120 in currency.

20. The defendant $22,120 in currency was made up of 629 bills, in five (5) different denominations.

   A. The defendant $22,120 in currency consisted of 124 $100.00 bills, one (1) $50.00 bill, 465 $20,000.00 bills, 35 $10.00 bills, and four (4) $5.00 bills.

   B. Of the 629 bills making up the defendant $22,120 in currency, the great majority of the bills, to wit, 465, were in the $20.00 denomination.

21. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug traffickers

11

1 and drug currency couriers. They knew illegal street drug
2 sales were virtually always conducted as an exchange of drugs
3 for currency.
4     A.  The most common denomination used in illegal
5 street drug transactions was the $20.00 bill.
6     B.  Approximately 75% of the defendant $22,120 in
7 currency was made up of $20.00 bills.
8   22. On June 27, 2018, at the SDIA NTF office, in
9 JACKSON'S presence, TFO Aiken, a trained and experienced
10 narcotic detection dog handler, used his trained and
11 certified narcotic detection dog, "Bagherra", to conduct an
12 examination of the defendant $22,120 in currency.
13     A.  TFO Aiken and Bagherra were trained and
14 certified as a dog handler and narcotic detection dog team.
15     B.  Bagherra was trained to display a behavior or
16 "alert" when she encountered the scents or odors of a variety
17 of controlled substances.
18     C.  TFO Aiken was trained and experienced in
19 recognizing Bagherra's trained behaviors or alerts.
20     D.  When exposed to the defendant $22,120 in
21 currency, Bagherra alerted to the presence of the scent of
22 one or more controlled substances upon the currency.
23     E.  TFO Aiken observed the alert, told Agent
24 Beauchamp of the alert, and explained its significance.
25   23. The defendant $22,120 in currency was seized for
26 forfeiture by the DEA as currency constituting proceeds of
27 the purchase(s) of controlled substances, and money possessed
28 //

12

with the intent to be furnished in exchange for controlled substances.

24. The defendant $22,120 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

25. Alternatively, the defendant $22,120 in currency constitutes proceeds of, or proceeds traceable to, an exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

26. Alternatively, the defendant $22,120 in currency was used or intended to be used to facilitate an exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

27. As a result of the foregoing, the defendant $22,120 in currency is liable to condemnation and to forfeiture to the United States for its use in accordance with Title 21, United States Code, §881(a)(6).

28. The defendant $22,120 in currency is presently deposited within the jurisdiction of this Court.

//
//
//

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the defendant $22,120 in currency, and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared.

DATED: November 29, 2018

ADAM L. BRAVERMAN
United States Attorney

s/ Bruce C. Smith
BRUCE C. SMITH
Assistant U.S. Attorney

## VERIFICATION

I, Jeanne Beauchamp, state and declare as follows:

1. I am a special agent with the Drug Enforcement Administration, assigned to San Diego Integrated Narcotics Task Force Team 8, and am one of the task force officers assigned to this investigation.

2. I have read the foregoing Complaint For Forfeiture and know its contents.

3. The facts set forth in the Complaint For Forfeiture are based upon my own knowledge or were facts furnished to me by other United States federal, state, or local law enforcement personnel, civilian witnesses, or other official Government sources.

Based on this information, I believe the allegations in the Complaint For Forfeiture to be true.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on November 27, 2018.

JEANNE BEAUCHAMP, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

## DEFENDANTS
$22,120.00 in U.S. Currency

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**'18 CV2697 DMS NLS**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
AUSA Bruce C. Smith, Phone: (619) 546-8266
USAO, 880 Front Street, Room 6293, San Diego, CA 92101-8893

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**TORTS — PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- [X] 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21 U.S.C. Section 881
Brief description of cause:
Narcotics trafficking

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes [X] No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 11/29/2018
SIGNATURE OF ATTORNEY OF RECORD: s/ Bruce C. Smith

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____